Andrew Y. Choung (CSB No. 203192)
achoung@nixonpeabody.com
Jennifer Hayes (CSB No. 241533)
jenhayes@nixonpeabody.com
**NIXON PEABODY LLP**
300 S. Grand Avenue, Suite 4100
Los Angeles, CA  90071-3151
Tel:  213-629-6000
Fax:  213-629-6001

Patrick Doyle (CSB No. 329810)
pdoyle@nixonpeabody.com
**NIXON PEABODY LLP**
One Embarcadero Center, 32nd Floor
San Francisco, CA 94111
Tel: (415) 984-8200
Fax: (415) 984-8300


Attorneys for Plaintiff
BRIDGENINE CORP.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIDGENINE CORP., | Case No. 2:26-cv-6164 |
| Plaintiff, | **COMPLAINT FOR PATENT INFRINGEMENT** |
| vs. | |
| APPLE INC., | JURY TRIAL DEMANDED |
| Defendant. | |

Plaintiff BridgeNine Corp. ("BridgeNine" or "Plaintiff") hereby alleges patent infringement against Defendant Apple Inc. ("Apple" or "Defendant") as follows:

### PARTIES

1. Plaintiff is a corporation organized and existing under the laws of Korea, having a principal place of business at B1-126-ma36, 13, Seoun-ro, Seocho-gu, Seoul, Korea.

2. Defendant is a corporation organized and existing under the laws of the State of California, with principal places of business at One Apple Park Way, Cupertino, CA 95014. Defendant may be served with process through its registered agent, CT Corporation System, 330 N Brand Blvd, Glendale, CA 91203.

### JURISDICTION AND VENUE

3. This patent infringement action arises under the patent laws of the United States, Title 35 of the United States Code ("U.S.C.") § 1 *et seq.*, including 35 U.S.C. §§ 271, 281, 283, 284 and 285.

4. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332, and 1338(a).

5. Defendant is subject to this Court's specific and general personal jurisdiction consistent with the principles of due process and/or the California Long Arm Statute.

6. Personal jurisdiction also exists over Defendant because it transacts substantial business either directly or through its subsidiaries, affiliates, or intermediaries, some or all of which are its agents or alter egos, with entities and individuals in this State and this District, by, among other things, making, using, selling, offering for sale, importing, advertising, making available, and/or marketing products and services that infringe one or more claims of the asserted patents, as alleged more particularly below.

7. Defendant has sufficient minimum contacts with this State and this District because it regularly solicits and transacts business herein, and/or because it has engaged in persistent conduct and/or has derived substantial revenue from goods and services provided in this State and this District.

8. Venue in this District is proper under 28 U.S.C. §§ 1391 and 1400(b) because,

- 2 -

among other things, Defendant has committed acts of infringement in this District and has regular and established places of business in this District.

9.      Defendant does business, offers to sell and sells infringing products and services throughout the United States, this State, and this District, and introduces infringing products and services into the stream of commerce knowing that they will be sold in the United States, this State, and this District.

10.      Defendant has authorized sellers and sales representatives and/or does business, offers for sale and/or sells products and services pertinent to this complaint across the United States, including throughout this State, including in and to consumers throughout this District.

11.      Defendant owns and operates the www.apple.com and apps.apple.com website, which is accessible by, through, and in this District and its residents.

12.      Defendant owns, leases, and/or operates in or out of one or more offices and/or other facilities in this District.

13.      Defendant maintains regular and established places of business within this District, including at:  offices at 8600 Hayden Pl, Culver City, CA 90232 and 8777 Washington Blvd, Culver City, CA 90232, and a campus under construction at 8888 Venice Blvd, Los Angeles, CA 90034; and numerous retail stores throughout this District, including at 10250 Santa Monica Boulevard, Los Angeles, CA 90067.

14.      Defendant's locations and facilities in this District are regular, physical, continuous, and established places of business.  Defendant established, ratified, and controls these places of business.  Defendant lists and describes these places of business on its own websites, on other public websites, and/or in its government filings.  Defendant employs thousands of employees at its places of business from which it conducts business, including the infringing conduct, in this District to its benefit.

15.      Defendant develops, makes, uses, imports, offers for sale, and/or sells in this State and this District products and services that infringe the asserted patents.  Defendant, directly and/or through intermediaries, ships, distributes, uses, offers for sale, sells, and/or advertises products and/or services in the United States, this State, and this District, including but not limited to

- 3 -

infringing products as detailed below.  Defendant solicits and has solicited customers in this State and in this District.  Defendant has paying customers, who are residents of and use and have used the infringement products and services in this State and this District.

16.     Defendant maintains a permanent and/or continuing presence within this District, and/or has the requisite minimum contacts with this District such that this venue is a fair and reasonable one.  Defendant has transacted and, at the time of the filing of this complaint, is continuing to transact business within this District, and has and continues to derive substantial revenue from infringing acts in this District.

## ASSERTED PATENTS

17.     Plaintiff owns the entire right, title, and interest in and to the following patents, including the right to seek damages for past and ongoing infringement:  U.S. Patent Nos. 8,633,961 ("the '961 Patent") and 8,072,505 ("the '505 Patent").

### The '961 Patent

18.     The '961 Patent is entitled "Mobile Terminal and Method of Providing Video Calls Using the Same."  The '961 Patent claims a foreign application priority date of December 2, 2010, was filed on November 30, 2011, was published on June 7, 2012, and was duly and legally issued by the United States Patent and Trademark Office on January 21, 2014.  The named inventors are Kwang Mo Jung, Sung Hee Hong, Byoung Ha Park, Kwang Soon Choi, Yang Keun Ahn, and Hoonjong Kang.  A true and correct copy of the '961 Patent is attached hereto as Exhibit 1.

19.     The '961 Patent was originally assigned to the Korea Electronics Technology Institute ("KETI").  Plaintiff was assigned the '961 Patent on May 19, 2026.

20.     The claims of the '961 Patent are directed to patent-eligible subject matter and satisfy the requirements of 35 U.S.C. § 101.

21.     The apparatus and methods taught by the '961 Patent solve technological problems and improve "a video call function that performs a call while seeing each other, rather than performing a call using only audio."[1]

---

[1] Ex. 1 at 1:43-45.

22.     For example, the patent explains that a problem in the prior art is that a "video call according to the related art transfers the user and backgrounds around the user to the third party. Therefore, the user's privacy and the privacy of others may be invaded."[2]

23.     The patent provides a solution "ensuring user's privacy at the time of performing a video call function among various functions of the mobile terminal and ensuring privacy capable of realistically observing a third party's appearance by applying a 3D technology, and a method of providing a video call using the same."[3]

24.     The patent also provides "a mobile terminal ensuring privacy while effectively using a chroma key effect and a peripheral noise removal function when the mobile terminal broadcasts a video and a method of providing a video call using the same."[4]

25.     The specification of the patent describes embodiments implementing the technological solution of the invention, including exemplary techniques and improvements.

26.     For example, the specification describes, in reference to the patent figures, a "mobile terminal is divided into a video call transmitting unit 110 and a video call receiving unit 130.  The video call transmitting unit 110 includes a video capturing module 110, a sound collection module 116, an individual video separation module 112, a composite video generation module 114, an individual audio detection module 118, and a video and audio data transmission module 102.  The video call receiving unit 130 includes a video and audio data receiving module 140, a display module 142, and a speaker 144."[5]

27.     For example, the specification also describes, in reference to the figures, a "mobile terminal includes a 2D camera 200, a 3D depth camera 210, a display 220, and a microphone 230."[6]

28.     For example, the specification explains that the "video capturing module 110 includes the 2D camera and the 3D depth camera.  A multi-view video and depth information

---

[2] *Id.* at 2:1-4.

[3] *Id.* at 2:9-14.

[4] *Id.* at 2:15-19.

[5] *Id.* at 3:32-41.

[6] *Id.* at 5:24-26.

- 5 -

PATENT INFRINGEMENT COMPLAINT
2:26-CV-6164

regarding a scene are needed in order to generate the three-dimensional video. A method of acquiring the depth information may be divided into a passive type and an active type. The passive type identifies the depth information of the scene using the captured image, which may correspond to a stereo matching method or a method of converting a two-dimensional video into a three-dimensional video. The active type is a hardware-based type using a distance sensor and uses equipment, such as a depth camera, a three-dimensional scanner, and so on, using a time of flight (TOF) sensor. The depth camera using the TOF sensor may obtain the actual depth information regarding the scene in real time."[7]

29. For example, the specification further explains that "the 2D camera 200 captures a video including the user video and the background video so as to perform the video call. The 3D depth camera 210 also captures the video including the user video and the background video so as to perform the video call, like the 2D camera 200. As described above, the 2D camera 200 and the 3D depth camera 210 need to be spatio-temporal synchronized so as to capture the same video. The boundary information between the user video and the background video are extracted using the depth information regarding the video captured by the camera 210. The user video is separated from the video captured by the 2D camera 200 using the extracted boundary information."[8]

30. For example, the specification describes exemplary techniques for "operation of the three-dimensional camera." '961 patent at 3:58. "The three-dimensional camera displays objects located near a camera by a white color and objects located far away from a camera by a black color. Therefore, it may be recognized that a video displayed by a white color in the three-dimensional video is a video of object located near the camera and a video displayed by a black color is a video of object located far away from the camera."[9]

31. For example, the specification further describes how the "three-dimensional camera configures a front part of a camera and includes an infrared pulse outputting unit and an infrared pulse receiving unit. The infrared pulse outputting unit outputs the infrared pulse to the front part

---

[7] *Id.* at 3:44-52.

[8] *Id.* at 5:29-40.

[9] *Id.* at 3:58, 3:59-65.

- 6 -

of the camera and the infrared pulse receiving unit receives infrared pulses reflected and returned from objects among the infrared pulses output from the infrared pulse outputting unit. The three-dimensional camera measures the time when the output infrared pulse is reflected and returned from objects. The three-dimensional camera measures a distance to objects using the measured time. The objects located at a distance far away from the camera are displayed as black by using the calculated distance information and the objects located at a distance near the camera are displayed as white. The images captured by the 2D camera and the 3D depth camera are the same at all times, such that spatio-temporal Synchronization needs to be performed. To this end, the 2D camera and the 3D depth camera may be located in a space adjacent to each other."[10]

32.    For example, the specification further describes exemplary techniques to "separate[] the user's video from the peripheral background in the video captured using the 3D depth camera. Generally, the user is located nearest the camera. Therefore, when only the user's appearance is recognized by limiting a recognition range of the 3D depth camera, only the user's appearance may be separated while disregarding the peripheral background. As described above, the 3D depth camera displays objects located at a near distance by a white color and objects located at the remote by a black color. Therefore, the individual video separation module 112 separates the video displayed by a white color from the captured video. In addition, the separation of the video displayed by a white color uses a predetermined threshold."[11]

33.    For example, the specification further describes exemplary techniques for "compos[ing] the depth information of the 3D depth camera with the images of the 2D camera to generate the composite video. Only the user video is acquired from the 2D video by using the boundary information between the user and the background that are acquired from the 3D depth camera. To this end, as described above, the 3D depth camera and the 2D camera need to have the same spatio-temporal synchronization. The acquired user video is composed with the stored background video, such that the composite video generation module 114 acquires the user video composed with the user desired background video rather than acquiring the existing captured

[10] *Id.* at 3:66-4:16.

[11] *Id.* at 4:17-30.

PATENT INFRINGEMENT COMPLAINT
2:26-CV-6164

background."[12]

## The '505 Patent

34.     The '505 Patent is entitled "Imaging Apparatus."  The '505 Patent claims an earliest foreign application priority date of July 23, 2008, was filed on July 15, 2009, was published on January 28, 2010, and was duly and legally issued by the United States Patent and Trademark Office on December 6, 2011.  The named inventors are Atsushi Sugita and Hidehiro Katoh.  A true and correct copy of the '505 Patent is attached hereto as Exhibit 2.

35.     The '505 Patent was originally assigned to Victor Company of Japan Ltd.  Plaintiff was assigned the '505 Patent on May 19, 2026.

36.     The claims of the '505 Patent are directed to patent-eligible subject matter and satisfy the requirements of 35 U.S.C. § 101.

37.     The apparatus and methods taught by the '505 Patent solve technological problems and improve an imaging apparatus that "allows a user to easily select the best imaging mode in accordance with imaging conditions, without specific and complex signal processing circuitry."[13]

38.     The patent explains that the problem in the prior art is that "imaging apparatuses with such multiple imaging modes require multiple procedures in selection of the best mode," and that prior art techniques for switching the mode order "requires specific procedures and signal processing circuitry for those conditions such as luminance and color of an image and an imaging time."[14]

39.     The Patent provides a solution in the form of "an imaging apparatus comprising: an imaging device to convert light from a target object into an electric signal carrying an image of the object; a video signal processor to generate a video signal based on the electric signal; a human face detector to detect at least a human face of at least one human if the human is contained in the image, based on the video signal; an on-screen display generator to automatically generate an on-screen signal for either a first imaging-mode menu window or a second imaging-mode menu

_____

[12] *Id.* at 4:31-42.

[13] Ex. 2 at 17:10-13.

[14] *Id.* at 1:33-35, 1:50-53.

PATENT INFRINGEMENT COMPLAINT
2:26-CV-6164

window each for use in selection of an imaging mode among a plurality of imaging modes, the first imaging-mode menu window being used when no human face is being detected by the human face detector, the second imaging-mode menu window being used when the human face is being detected by the human face detector."[15]

40.     The patent also provides an imaging apparatus with "a controller to automatically control an order of the imaging modes so that the order of the imaging modes is changed between a first case where no human face is being detected by the human face detector and a second case where the human face is being detected by the human face detector, when the imaging modes are to be switched through the operation unit."[16]

41.     The specification of the patent describes embodiments implementing the technological solution of the invention, including exemplary techniques and improvements.

42.     For example, the specification describes, in reference to the patent figures, that "light from a target object is captured by a lens 1.  The light is then incident on an imaging device 3, such as CCD, while its quantity is being adjusted by an aperture unit 2 that has an aperture 21 and an aperture driver 22.  The light incident on the imaging device 3 is converted into electric pixel signals and then supplied to a video signal processor 4.  On receiving the pixel signals, the video signal processor 4 generates video signals, such as, RGB signals, with specific signal processing."[17]

43.     For example, the specification further describes that "the video signals that have been applied the specific signal processing are then supplied to a human face detector 5 and an OSD (On Screen Display) superimposer 9.  On receiving the video signals, the human face detector 5 detects one or more human faces contained in an image, the number of the faces and their positions by detecting skin color portion of the image or by using known pattern recognition technique."[18]

44.     For example, the specification explains that "the controller 6, for example, a

---

[15] *Id.* at Claim 1, 2:35-47

[16] *Id.* at Claim 14.

[17] *Id.* at 3:59-4:1.

[18] *Id.* at 4:5-9.

PATENT INFRINGEMENT COMPLAINT
2:26-CV-6164

microprocessor, controls an OSD generator 8 in accordance with the face detection information and/or operation on an operation unit 7.  The OSD generator 8 generates an OSD signal under control by the controller 6 and supplies the OSD signal to the OSD superimposer 9.  The OSD superimposer 9 superimposes the OSD signal on the video signals supplied from the video signal processor 4.  The video signals superimposed with the OSD signal are then displayed on a display screen 10."[19]

45.    For example, the specification further explains that when the human face detector 5 detects no human faces, "the OSD generator 8 generates an OSD signal for an imaging-mode menu window $201_{2A}$ under control by the controller 6," and that when "the human face detector 5 detects a human face, the detector 5 supplies face detection information including the number of the face and its position to the controller 6," which in turn causes the display of a different imaging-mode menu window with imaging modes suited for human imaging, such as PORTRAIT, SPORTS, and SPOTLIGHT.[20]

46.    For example, the specification describes exemplary techniques for the operation of the imaging-mode menu window setting.  The controller 6 "determines whether a human face is being detected based on the face detection information from the human face detector 5.  When it is determined that no human faces are being detected (NO in Step S13), the controller 6 sets the menu window at the imaging-mode menu window $201_{2A}$ for scenery imaging use.  On the contrary, when it is determined that a human face is being detected (YES in Step S13), the controller 6 sets the menu window at the imaging-mode menu window $201_{2B}$ for human imaging use."[21]

47.    For example, the specification further describes how the imaging apparatus adapts to the detected human's demographic characteristics.  "The human face detector 5 of the second embodiment determines the sex and age of a human contained in an image."   When the detector "detects the face 802 of the child 801, as shown in (b) of FIG. 8, the controller 6 sets the imaging-mode menu window $201_{8B}$ with the mode of SPORTS, that may be frequently used in child imaging,

---

[19] *Id.* at 4:12-21.

[20] *Id.* at 4:56-58, 5:33-35.

[21] *Id.* at 6:8-19.

PATENT INFRINGEMENT COMPLAINT
2:26-CV-6164

positioned at the top on the list."   When the detector "detects the face 804 of the woman 902, as shown in (b) of FIG. 9, the controller 6 sets the imaging-mode menu window $201_{9B}$ with the modes of PORTRAIT and SPOTLIGHT that may be frequently used in woman imaging."[22]

48.    For example, the specification further describes exemplary techniques for setting the order of imaging modes in accordance with the position of a detected human face.  "The controller 6 determines which of the regions 45C, 45R and 45L is closest to the center 400 of the face 203.   The controller 6 gives higher priority to SPOT METERING than BACKLIGHT COMPENSATION that may not be used frequently when a human face is being detected.  And, then the controller 6 sets SPOT METERING RIGHT at MODE 1, that is the imaging mode based on the brightness on the right region 45R closest to the center 400 of the face 203, because it is highly likely that a user will perform spot metering on the face 203."[23]

49.    For example, the specification further describes exemplary techniques for handling a plurality of detected human faces.  "When the human face detector 5 detects human faces, for example, three faces, based on the face detection information from the detector 5, the controller 6 outputs a control signal to the OSD generator 8 so that the generator 8 generates an OSD signal for face-detection zone windows 61, 62 and 63 having frames that cover faces 64, 65 and 66, respectively."   The controller then "sets these imaging modes at MODE 1 to 3 and BACKLIGHT COMPENSATION at MODE 4," based on "a presumption that SPOT METERING will be used more often than BACKLIGHT COMPENSATION when human faces are detected and SPOT METERING will be performed at a region of each face."[24]

---

[22] *Id.* at 8:1-3, 8:22-26, 8:30-34.

[23] *Id.* at 10:20-27.

[24] *Id.* at 15:25-30, 15:59-60, 16:1-4.

PATENT INFRINGEMENT COMPLAINT
2:26-CV-6164

**ACCUSED INSTRUMENTALITIES**

50.    Defendant makes, uses, sells, and/or offers to sell in, and/or imports into the United States systems, products, devices, components, and/or services that infringe one or more claims of the asserted patents (the "Accused Instrumentalities").

51.    The Accused Instrumentalities that infringe the '961 Patent include at least systems, products, devices, components, and/or services that feature depth mapping and boundary extraction for use in video and image capture and generation, including but not limited to Apple iPhones, iPads, MacBooks, and Vision Pro headset.

52.    The Accused Instrumentalities that infringe the '505 Patent include at least systems, products, devices, components, and/or services that feature face detection and multiple imaging-modes, including but not limited to Apple iPhones, iPads, MacBooks, and Vision Pro headset.

53.    Appendix A provides a non-exhaustive list of Accused Instrumentalities.

**COUNT I – INFRINGEMENT OF THE '961 PATENT**

54.    The '961 Patent is valid and enforceable.

55.    Defendant infringes at least claim 1 of the '961 Patent.

56.    Appendix B details the manner in which the Accused Instrumentalities infringe by way of an exemplary chart as illustrated through a representative example.  On information and belief, infringement of this patent by other Accused Instrumentalities is materially or substantially the same.

**COUNT II – INFRINGEMENT OF THE '505 PATENT**

57.    The '505 Patent is valid and enforceable.

58.    Defendant infringes at least claim 1 of the '505 Patent.

59.    Appendix C details the manner in which the Accused Instrumentalities infringe by way of an exemplary chart as illustrated through a representative example.  On information and belief, infringement of this patent by other Accused Instrumentalities is materially or substantially the same.

PATENT INFRINGEMENT COMPLAINT
2:26-CV-6164

**NOTICE AND INFRINGEMENT**

60. On information and belief, Defendant had actual and/or constructive prior notice of the asserted patents and/or its infringing activities. To the extent that Defendant contends it lacked actual knowledge of the asserted patents and/or its infringing activities before the time of service of this complaint, it was willfully blind by deliberately avoiding investigating, inspecting, and/or instructing its employees not to investigate the asserted patents and/or its infringing activities.

61. Defendant has actual notice and knowledge of the asserted patents and/or its infringing activities no later than the filing of this complaint and/or the date this complaint was served upon Defendant.

62. Defendant has committed and continues to commit acts of direct infringement of the asserted patents by making, using, selling, offering to sell, and/or importing in and into the United States, this State, and this District the Accused Instrumentalities.

63. Defendant has been and is indirectly infringing the asserted patents by actively inducing or contributing to the direct infringement by others, in the United States, this State, and this District.

64. Defendant has induced and continues to induce its subsidiaries and affiliates, customers, and other third parties, such as resellers and end-consumers, to directly infringe the asserted patents by making, using, selling, offering to sell, and/or importing into the United States the Accused Instrumentalities through affirmative acts.

65. The affirmative acts of inducement by Defendant include, but are not limited to, any one or a combination of encouraging and/or facilitating third-party infringement through the advertisement, marketing, offering for sale, promoting, and dissemination of the Accused Instrumentalities and their components; and creating and publishing promotional and marketing materials, supporting materials, product manuals, and/or technical support and information relating to the Accused Instrumentalities.

66. Defendant took and continues to take active steps to encourage end users to use and operate the Accused Instrumentalities, despite knowing of the asserted patents in the United States, in a manner it knew directly infringes each element of the claims of the asserted patents. Further,

PATENT INFRINGEMENT COMPLAINT
2:26-CV-6164

Defendant provided product manuals and other technical information that cause its subscribers, customers, and other third parties to use and to operate the Accused Instrumentalities for their ordinary and customary use, such that these third parties have directly infringed the asserted patent, through the normal and customary use of the Accused Instrumentalities.

67.    Defendant specifically intended and was aware that the ordinary and customary use of the Accused Instrumentalities would infringe the asserted patents.

68.    Defendant knew and knows that the induced conduct would constitute infringement, and intended said infringement at the time of committing the aforementioned acts, such that those acts and conduct have been and continue to be committed with the specific intent to induce infringement, or to deliberately avoid learning of the infringing circumstances at the time those acts were committed, so as to be willfully blind to the infringement they induced.

69.    Defendant has contributed and continues to contribute to the infringement of its subsidiaries and affiliates, customers, and other third parties, such as resellers and end-consumers of Accused Instrumentalities, to directly infringe the asserted patents by offering to sell, selling or importing within or into the United States, this State and this District a component of the Accused Instrumentalities, which constitutes a material part of the invention and are not a staple article or commodity of commerce suitable for substantial noninfringing use.

70.    Defendant knew and knows that the component is especially made or adapted for use in infringement of the Asserted Patents.

71.    Defendant also infringes jointly and/or vicariously.  Defendant engages or participates in a joint enterprise and/or collective conduct of making, using, offering to sell, selling, and/or importing of the Accused Instrumentalities with at least one or more subsidiaries and affiliates, customers, and/or other third parties.  Defendant acts under or provides the direction and/or control of one or more different parties.  The infringing acts of subsidiaries, affiliates, customers and other third parties are attributable to Defendant.

72.    Defendant's conduct constitutes willful infringement of the asserted patents. Defendant has had knowledge of the asserted patents and infringement thereof, and yet has deliberately and intentionally continued to infringe with reckless disregard for Plaintiff's patent

- 14 -

rights. Defendant's use of the asserted patents is not licensed or authorized by Plaintiff in any way. Therefore, Defendant is liable for infringement of the asserted patents and that infringement has been and continues to be willful in nature.

73.     Plaintiff has incurred and will continue to incur substantial damages, and has been and continues to be irreparably harmed by Defendant's infringement. Therefore, Plaintiff is entitled to an injunction, actual and/or compensatory damages, reasonable royalties, pre- and post-judgment interest, enhanced damages, attorney fees, and costs.

74.     Plaintiff is in compliance with the marking or notice requirements of 35 U.S.C. § 287 to the extent applicable. The filing of this action constitutes notice.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A.     Enter judgment in favor of Plaintiff that each asserted patent is valid and enforceable;

B.     Enter judgment that Defendant has infringed one or more claims of each asserted patent, in violation of the United States Code, including, without limitation, 35 U.S.C. § 271;

C.     Enter judgment that Defendant's infringement is or has been willful;

D.     Award Plaintiff damages adequate to compensate Plaintiff for Defendant's past infringement, and any continuing or future infringement through the date such judgment is entered, including prejudgment and post-judgment interest, costs, expenses and an accounting of all infringing acts including, but not limited to, those acts not presented at trial;

E.     Increase damages awarded to Plaintiff in this case to three times the damages amount found by the jury or assessed by the Court pursuant to 35 U.S.C. § 284;

F.     Declare this case exceptional and award Plaintiff its reasonable attorney fees and costs incurred in bringing and prosecuting this action pursuant to 35 U.S.C. § 285;

G.     Enjoin Defendant and its subsidiaries, and their officers, agents, servants, employees, and all persons in active concert with any of the foregoing from further infringement of the asserted patents, or if its infringement is not enjoined, that Defendant be ordered to pay Plaintiff ongoing royalties for any post-judgment infringement of the asserted patents; and

PATENT INFRINGEMENT COMPLAINT
2:26-CV-6164

H.      Grant Plaintiff all such other relief as the Court deems just and reasonable.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable pursuant to Federal Rule of Civil Procedure 38 and other applicable law.

Date: June 5, 2026                              */s/ Jennifer Hayes*

Andrew Choung (CSB No. 203192)
achoung@nixonpeabody.com
Jennifer Hayes (CSB No. 241533)
jenhayes@nixonpeabody.com
**NIXON PEABODY LLP**
300 South Grand Ave, Suite 4100
Los Angeles, CA 90071
Tel: (213) 629-6000
Fax: (213) 629-6001

Patrick Doyle (CSB No. 329810)
pdoyle@nixonpeabody.com
**NIXON PEABODY LLP**
One Embarcadero Center, 32nd Floor
San Francisco, CA 94111
Tel: (415) 984-8200
Fax: (415) 984-8300

*Attorneys for Plaintiff BridgeNine Corporation.*

PATENT INFRINGEMENT COMPLAINT
2:26-CV-6164